### CUYAHOGA CONTRACTING CO. v. CITY OF PORT HURON.

(Circuit Court of Appeals, Sixth Circuit. May 9, 1916.)

No. 2709.

Municipal Corporations ⬥354—Contracts—Right of Contractor to Rescind.

A contractor with a city for the construction of a canal, which obtained an extension of nine months in the time for completing the same, and

---

after the expiration of six months abandoned the work, admitting its inability to complete it within the extended time, *held* not entitled to a rescission of the contract on the ground that it was induced by misrepresentations of the city engineer, in his profile map, as to the character of the material to be excavated, nor because of changes in the route, increasing the cost, which were made by the city many months before and were not objected to at the time.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 886, 887; Dec. Dig. ☞354.]

Appeal from the District Court of the United States for the Eastern District of Michigan; Arthur J. Tuttle, Judge.

Suit in equity by the Cuyahoga Contracting Company against the City of Port Huron. Decree for defendant, and complainant appeals. Affirmed.

H. E. Spalding, of Detroit, Mich., for appellant.

Joseph Walsh and Lincoln Avery, both of Port Huron, Mich., for appellee.

Before WARRINGTON and KNAPPEN, Circuit Judges, and KILLITS, District Judge.

KILLITS, District Judge. The appellant, Cuyahoga Contracting Company, an Ohio corporation, on February 10, 1902, entered into a contract with the city of Port Huron, Mich., for the construction of a canal in the rear of the city of Port Huron extending from Lake Huron to Black river. It is unnecessary to set out the contract in full. Those provisions necessary to be understood for the purpose of this decision may be summarized as follows:

Appellant, known in the contract as the party of the second part, agreed to start the actual work of constructing a canal within 30 days of the time of executing the contract, to make fair monthly progress in carrying on the undertaking, and to fully complete and finish the canal, bridges and other work embodied in the terms of the contract within one year from the date thereof.

For failure, neglect or refusal to go on with the work or to carry out the reasonable instructions of the city engineer, it was provided that the city might serve written notice upon the party of the second part "to carry out such instructions and if within ten (10) days thereafter, said party of the second part shall fail to satisfy" the city "of its ability and intention to carry out such instructions and to complete the work within the time agreed upon, then in that case the party of the first part shall have the right to declare this contract forfeited," the money due or becoming due to the party of the second part on the contract to be thereby forfeited to the city as liquidated damages, with the privilege to the city to let the work to other parties without incurring any liability. This feature of the contract provided also that any expense above the unpaid balance of the contract price, incurred by the city under these circumstances in completing the work, should constitute a breach of the bond of the second party and that the second party and its sureties should become liable therefor.

Damages in the sum of not more than $15 per day were stipulated for each and every month that the work was delayed after the expiration

of the time of performance provided by the contract. The canal was to be completed according to plan A on file in the city engineer's office and the appellant, the second party, was to excavate and remove the material, of "whatever name or nature (except solid rock), required for the construction of such canal" included within the dimensions set forth in the plan.

If solid rock were found (and solid rock was defined to be "rock in its original formation and not broken rock or boulders, detached from such formation") the second party was to be compensated therefor at the rate of $1.15 per cubic yard as an extra; but this provision was coupled with the condition:

"That said second party is to excavate and remove the material, of whatever nature or name, for the construction of the said canal without additional compensation, except such solid rock as may be found in layers, if any there be."

An additional provision was to the effect:

"That all excavation will be classed as earth excavation except solid rock, should there be any, and nothing will be allowed for cave-ins, landslides or upheavals beyond the line of excavation occurring before the completion and acceptance of the canal."

It was provided that on or before the 10th day of the month 90 per cent. of the estimate of the previous month's work should be paid by the city to the party of the second part, the remaining 10 per cent. to be withheld until after the completion of the work.

The specifications were made part of the contract and appear in the record. No part of their terms is material for this decision, save that the city reserved therein the right to make alterations in the plans and details of the work when to do so seemed advantageous, and it was—

"to be distinctly understood that any increase or reduction of quantities, resulting from such alterations, is not to be assumed as a basis of a claim against the city for damages for loss of prospective profits."

The work progressed very slowly, and at the expiration of the limit for completion set by the contract, namely, February 10, 1903, about 22 per cent. only of the total amount of work to be done had been accomplished. At the company's request, at that time, for a year's extension of time, the city granted less than 10 months, or until December 1, 1903. By the first of August of the second year about 12 per cent. additional of the total amount of work had been done, wherefore, at that time, about a third only of the entire contract had been completed. The August estimate was not promptly made. There is some dispute in the record whether one was made at all, but no payment was ever made for work done in July, 1903, which was approximately of the value of $4,000 at the contract rate. On the 18th of August, following an investigation of the work in behalf of the city, the canal commission passed a resolution reciting that the Cuyahoga Contracting Company had failed and neglected to progress with the work as provided in its contract and expressing the opinion of the commission that the contractor had not the ability or intention to complete the work within the time agreed upon as extended. The commission therefore

recommended to the city that notice as provided in the contract be given to the company and that the latter satisfy the city "of its ability and intention to carry on said work and complete the same within the time agreed upon." A notice authorized by the council of the city and pursuant to this resolution was served upon the president of the Cuyahoga Contracting Company August 19, 1903, whereupon the company, August 21, 1903, served notice upon the city of its intention to abandon the contract. No effort was made by the company to meet the city's request for information as to the company's intentions or as to the prospect, in its opinion, that it would be able to finish the work by December 1, 1903. The notice of abandonment by the company was the only reply to the city's notice of August 19.

In the work preliminary to the advertising for bids for this improvement the city engineer had made a profile of the proposed excavation, the data for which, as to character of soil and material to be encountered in the excavation, having been obtained by borings. The contract did not make this profile part of its terms nor were either the profile or its representations embodied in the specifications. It appears, however, that one Rosenstock, the representative of the Cuyahoga Contracting Company, upon whose reports to his employer the contract was entered into by the latter, had himself, prior to the letting of the contract, seen the profile and had examined the borings. He also had familiarized himself with the surface indications and topographical peculiarities along the proposed route. In the actual work of excavation, so far as done, it was early discovered by the company that the profile indications were misleading to the point that materials difficult to be excavated existed in substantially greater amounts than appeared upon the profile. After the contract had been signed and the lines staked out, the city, near the northeast end of the excavation, made a change in the route which placed the contractor to some substantial inconvenience in excavating, through its inability to deposit excavated material on one side of the line because of the proximity of a cemetery. These untoward conditions were known to the company long prior to the time when it applied for an extension of time to complete the contract and were not complained of, at least not to the extent of making them grounds supporting the demand for any relief, until after the city notified the company as above stated. It also appeared that other difficulties, the encountering of which perhaps was not fully considered by the company in signing the contract, such as swampy places and overflowed lands and difficult water courses, were either well known to Rosenstock before the contract was signed, or the peculiar hardships they entailed were manifested shortly after the beginning of the work.

The notice served on the city by the company, referred to above, and which was intended to be preliminary to an action to rescind the contract, recited the discovery that the profile was incorrect and that the character of the soil was different from that represented in it to a very material and damaging extent, and that the route had been changed, shifting the line, causing peculiar difficulties. It concluded with these paragraphs:

"For these and other reasons we desire to notify you that it is not our intention to proceed further with the canal. We were induced to enter into the contract by representations as to conditions which we find do not exist, and hereby give notice to you of our intention to take proceedings for a rescission of the contract and for a recovery from the city of the damages arising from such representations.

"In addition the city has at various times violated the provisions of the contract relative to payments to be made to the company. The contract contained an express provision for the making of estimates by the city engineer at stated periods, upon which we were entitled to receive 90 per cent., but this clause has been repeatedly violated by the city, and the last estimate made by the city engineer entirely ignored and no provision whatever made for payment as required by the contract."

Upon the receipt of this notice, the city made other arrangements for the completion of this improvement, the company not offering anything further.

The case is before this court on appeal from the decree of the District Court for the Eastern District of Michigan, dismissing the complaint of the Cuyahoga Contracting Company, complainant, against the city. The issues before the District Court, which tried the case on its merits, were attempted to be made by the appellant in an amended bill of complaint filed March 25, 1908, reciting, among other things, the facts as above set forth and demanding that the city be restrained from attempting to recover from the plaintiff and its sureties the excess expense incurred by the city in completing the job, that the contract between it and the city be declared null and void and that its bond be canceled with release of its sureties, and that an accounting be had between the city and the complainant for the damages and expenditures incurred by the complainant in its attempt to perform the contract.

Consideration of the record of this cause had by this court, and of the arguments of counsel thereon, leads to a conclusion that we should affirm the decree dismissing the bill.

It is insisted that the notice given by the city August 19, 1903, was not authorized by the terms of the contract. Whether it was within the letter of the contract or not, it was certainly within its spirit. Complainant, in its notice August 21, of abandonment, predicates no ground of rescission upon the fact that the city served the notice of two days before. It was not a final and peremptory notice to abandon the work. It rather invited the company to meet the city and disclose what reliable assurances the company could offer that it could comply with the terms of the contract, even within the extension of time granted by the city. There is nothing in this record which, in our judgment, serves to excuse the company from accepting the invitation of the city to counsel together upon the situation. The city had the right to insist that much better progress be made than was then in prospect. It was anxious to have the work completed, and there is nothing to indicate that its attitude was unreasonable.

Doubtless the city clearly saw what was the fact, as admitted by the officers of the company, including the president, who was its executive officer, that the job could not be completed by the company within the extended time. Mr. Pelton, president of the company, himself testified that even with the new equipment which the company contemplated putting on, it would take "six months hard summer working" to com-

plete the job *after* the extended time had expired. Men on the ground occupying superior positions in the company's work gave similar testimony. In other words, in the middle of August, 1903, having been on the job then eighteen months and more than six months beyond the time it was originally contracted should see full completion, the Cuyahoga Contracting Company realized that it could not hope to finish its job without the favor of another extension of time covering practically another working year, or most of the season of 1904. Mr. Pelton, the president, testified that he had obtained the first extension from the city with difficulty, not getting the full time he desired and it is reasonable to assume that when, August 21, 1903, he issued for his company the notice to the city of abandonment, he felt that further like favors from the city were impossible to be secured. That the company was not in position to demand another extension is clear. In March, 1903, after the expiration of the original time for completion, and before an extension was granted, the city had mulcted the company in the sum of $200 on the per diem penalty for nonfulfillment, deducting that sum from the payment for March work. That a failure to complete the work by December 1, 1903, would be followed by the city's insistence on this penalty clause there was little reason to doubt.

All this suggests that the situation must have appeared hopeless to the company after the city's very natural dissatisfaction was manifested by the action of the canal commission and the council. The imposition of penalties for delays inevitable after December 1st meant wiping out more than any possible profits from the completion of the work. We cannot but feel that the company's embarrassment, because of its slow progress, and because of the attitude which the city was assuming, was the motive impelling the notice, which gave as reasons for abandonment facts which had been more available to support such a notice months before than in August. The record shows undoubtedly that prior to the making of the contract the company had full warning of all the probable difficulties in the work actually encountered for which its own default was not responsible, whether in fact Mr. Rosenstock actually apprised his superior of the situation or not. Mr. Pelton, who signed the contract for the company, testified that he relied entirely for all his knowledge of the situation influencing his making the contract upon Mr. Rosenstock, who, it was equally evident from the record, was on the ground in such relationship to the company at Cleveland as to bind it by the knowledge which he acquired. The change in route near the cemetery was under a right specially reserved to the city by a clause in the specifications made part of the contract, and, for all the record informs us otherwise, the company accepted the inconveniences and burdens of the change and worked at the excavation on the new line months before August without in any way then offering the objection that it was being unduly burdened by the change. The inference from the evidence is that the delays to the company incident to the change of route, and to other disagreements of detail or unexpected obstacles or extra work together did not work an extension of time greater than that actually granted by the city, and consequently, if justifiable grounds of complaint, they did not give the company a right to demand a further extension. There was nothing in the law

of Michigan, as it existed when the contract was let, which made the city responsible for the representations of the profile, nor did the contract place that burden upon the city.

The considerations of the foregoing paragraph dispose of the first ground of rescission quoted above. Indeed, all of the causes of dissatisfaction alleged then were old long before August 21, 1903. There remains the charge that the city violated the contract relating to payments. There is no evidence to support this ground as to any payments due prior to August, 1903. In fact the evidence shows that, without exception, the city made payments on the days when the estimates were made, and that, in most cases, the estimates were made within the contract periods. If any dissatisfaction existed on this ground it was not made to appear in evidence. Nor does it appear that the delay of the August estimate for July work to August 19 was deliberate on the part of the city, or that failure to make and pay it contributed to make it impossible for the company to complete the work within the extended time. Assuming that an estimate was made, as the appellant contends, we think that the circumstances justified the city in withholding its payment until the company should make it reasonably plain that it would make such progress thereafter as to give the city reasonable hope that its canal would be completed by December 1, 1903. If the fact was that the company was without ability to perform its contract (and the city's fears of that condition were certainly warranted) the city, because it could justly refuse another extension, was within its rights in refusing to pay any more money. Suppose, for instance, the company, instead of giving its notice of August 21, had first met the city in response to the latter's invitation of August 19, and had there confessed to the city, what Mr. Pelton and others admitted on the stand, that, under the most favorable circumstances the company would need most of the year succeeding December, 1903, to complete the job, how could it be said that the city was under obligation to acquiesce, and to signify its acceptance of the inevitable, for which only the company was responsible, by making payment of the August estimate? Under these circumstances common prudence would suggest withholding the payment and this would have been justified under the contract, as there would have been then a situation entirely within the contract, one when, to quote from that instrument, the company failed to satisfy the city "of its ability to complete the work within the time agreed upon." Such a situation gave the city the right to declare the contract forfeited, and to hold deferred payments as liquidated damages.

This case, in all particulars important for our conclusions, is quite similar to that of Sanitary District v. Ricker et al., 91 Fed. 833, 34 C. C. A. 91, decided by the Circuit Court of Appeals of the Seventh Circuit. We are satisfied that the case before us should be determined as that case was decided. The decree below therefore should be affirmed, but without prejudice to the right of both parties to try out in action at law any or all questions of pecuniary accounting growing out of their contractual relationship, including the claimed liability of the city for extra work, so far as the questions concerned in such accounting are not inconsistent with the conclusions stated in this opinion.